IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

ALBANY MEDICAL COLLEGE,

                    Plaintiff,                    Civil Action No.
                                                  1:13-CV-0108 (GLS/RFT)

          v.

SMITHS MEDICAL ASD, INC.,

                    Defendant.

_____

APPEARANCES:                          OF COUNSEL:

FOR PLAINTIFF:

HESLIN ROTHENBERG FARLEY              NICHOLAS MESITI, ESQ.
& MESITI P.C.                         BRETT M. HUTTON, ESQ.
5 Columbia Cir.
Albany, NY 12203

FOR DEFENDANT:

MORGAN, LEWIS & BOCKIUS LLP           J. KEVIN FEE, ESQ.
1111 Pennsylvania Ave., N.W.
Washington, D.C. 20004


DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Plaintiff Albany Medical College ("AMC"), a medical school located in Albany, New York, has commenced this action against Smiths Medical ASD, Inc., ("Smiths Medical"), a supplier of medical products and devices headquartered in St. Paul, Minnesota, alleging patent infringement. In its complaint, as amended, AMC alleges that Smiths Medical has infringed certain claims contained within four separate but related patents, all involving the design and use of a safety intravenous catheter assembly and method for use with a needle. Smiths Medical has denied infringement, and asserted counterclaims seeking declaratory judgments of non-infringement and patent invalidity.

The parties have requested that the court construe several claim terms from the four patents in suit that fall into three broad categories. Based upon the parties' submissions and a claim construction hearing conducted on March 19, 2014, I recommend that those disputed terms be construed as set forth below.[1]

---

[1]    The issue of claim construction has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). Dkt. No. 24.

# I.  BACKGROUND

At the center of this action are four patents granted by the United States Patent and Trademark Office ("PTO"), including United States Patent No. 6,221,047 ("'047 Patent"), issued on April 24, 2001, and entitled "Safety Intravenous Catheter Assembly and Method for Use with a Needle"; United States Patent No. 6,695,814 ("'814 Patent"), issued on February 24, 2004 and entitled "Safety Intravenous  Catheter Assembly and Method for Use with a Needle"; United States Patent No. 7,569,033 ("'033 Patent"), issued on August 4, 2009, and entitled "Safety Intravenous Catheter Assembly"; and United States Patent No. 8,133,206 ("'206 Patent"), issued on March 13, 2012, and entitled "Safety Intravenous Catheter Assembly."  Dkt. Nos. 7-1–7-4.  All four patents list Dr. Elliott Stephen Greene, an AMC physician, and Jason Andrew Greene as inventors, and AMC as an assignee, and derive from a patent application filed on July 31, 1998.  *Id.*

The patents in suit relate to intravenous catheters used to provide vascular access to patients for the purpose of administering intravenous fluids, medications, and blood.  Dkt. No. 7 at 2.  In order to insert such a catheter into a patient, a medical practitioner must first insert a guide needle and a tube portion of the catheter into the patient's vasculature,

and then withdraw the guide needle. *Id.* at 3. The patents disclose a

design and use of a safety guide needle device that guards against

vulnerability of the medical practitioner to an exposed needle tip when the

guide needle is withdrawn. *Id.* at 4. This safety feature is accomplished

by use of an axial bore extending through a catheter hub, and a second

axial bore extending through the needle cover, co-axial with the axial bore.

*See, e.g.,* '047 Patent, 2:51-55. The catheter hub contains a notch in the

interior bore, extending outwardly. *Id.* at 2:55-56. A movable notch clip is

joined with the needle cover in such a way that it can engage the notch of

the catheter hub, thereby locking the catheter hub and needle cover in

place so long as the needle is extended to or past the distal portion of the

notch clip. *Id.* at 2:56-63. When the needle is withdrawn past the distal

portion of the notch clip, the notch clip disengages from the notch,

enabling the catheter hub to separate from the needle cover. *Id.* at 2:63-

67.

Shown below is the structure designed by the inventors, as illustrated by Figures 2, 3, and 4 of the '814 Patent.



fig. 2          fig. 3          fig. 4

Those figures depict a catheter cannula **19** and an attached catheter hub **18** with an axial bore **20** extending through the catheter hub **18**. '814 Patent, 4:57-59. Also shown are a needle cover **22** having a first end **24** insertable into the axial bore **20**. *Id.* at 4:60-61. A second axial bore **26** extends through the needle cover **22**, preferably co-axially to the axial bore **20** when in an assembled state *Id.* at 4:61-64. The assembly **10** further includes a notch **28** located in, and extending outward from, the axial bore of the catheter hub **18.** *Id.* at 5:5-6. The '814 Patent specification states that "[t]he notch is preferably a continuous circumferential notch" in order to permit the catheter hub to be rotated around the needle cover when the two are fully engaged. *Id.* at 5:6-10.

In order to accomplish its objective, the assembly includes a notch clip **30** joined with the needle cover and positionable to permit engagement with the notch **28** of the catheter hub. '814 Patent, 5:10-12. The '814 patent discloses a preference that the inner surface of the notch clip be "substantially parallel to the second axial bore when in the rest position and in not forceful contact with the needle **12**, so that the notch clip at most rests against the needle as in side-by-side non-forceful contact." *Id.* at 5:12-16. The patent specification notes that the notch clip should preferably be fabricated from a resilient material that permits

flexion radially with minimal force provided by the notch **28** and the bottom portion of the catheter hub **18** as the latter disengages from the needle cover. *Id.* at 5:31-34. Disengagement preferably occurs only when a needle tip **16** is located prior to the distal portion of the notch clip. *Id.* at 35-37.

The manner in which the invention operates to protect the medical practitioner inserting a catheter from potential exposure to a needle is depicted in Figures 5-10 of the '814 Patent, shown below:





fig. 8    fig. 9    fig. 10

Figure 7 shows that, after insertion as depicted in Figures 5 and 6, the needle is locked into place by virtue of the notch clip **30** engaging the notch **28** of the catheter hub. '814 Patent, 7:31-43. After the needle tip **16** and a portion of the cannula **19** of the catheter is inserted into a recipient,

8

the cannula **19** typically is completely advanced into the blood vessel, while the needle case remains stationary. *Id.* at 7:43-50. At this point the catheter hub **18** is adjacent to the skin at the catheter insertion site. *Id.* at 49-50. The needle is then withdrawn from the axial bore **20** and second axial bore **26**. *Id.* at 52-54. As the needle is withdrawn past the distal portion **32** of the notch clip, the flexibility of the notch clip's material permits it to disengage from the notch **28**, allowing the needle to be withdrawn while the tip is covered by the needle cover and not exposed. *Id.* at 8:43-9:5.

Claim 1 of the '047 Patent is representative of the forty-eight asserted claims contained within four patents in suit.[2] That claim provides as follows:

> 1. A safety intravenous catheter assembly for use with a needle, comprising:
>
> a catheter hub having a first axial bore extending through the catheter hub;
>
> a needle cover having a first end of the needle cover insertable in the first axial bore and a second axial bore extending through the needle cover and co-axial with the first axial bore;

---

[2] AMC alleges Smiths Medical has infringed (1) Claims 1-3, 7-11, and 13-15 of the '047 Patent; (2) Claims 10 and 11 of the '814 Patent; (3) Claims 1-5, 9-15 17-19, and 25-33 of the '033 Patent; and (4) Claims 1-11 of the '206 Patent. Dkt. No. 27-5 at 2; Dkt. No. 26 at 10.

a continuous circumferential notch extending outwardly in the first axial bore of the catheter hub;

a notch clip joined with the needle cover and positionable to engage the notch of the catheter hub, the notch clip having a distal portion and wherein the notch clip engages the notch and locks the catheter hub in engagement with the needle cover when the needle cover is inserted in the first axial bore and a tip of the needle is inserted in the second axial bore at least adjacent or past the distal portion of the notch clip, wherein the notch clip disengages the notch and enables the catheter hub to pass out of engagement with the needle cover when the tip of the needle is located in the second axial bore prior to the distal portion of the notch clip, wherein the notch clip is maintainable adjacent the needle throughout a range of positions from being in forceful contact with the needle to being spaced from the needle when the needle cover is inserted in the first axial bore and the tip of the needle is inserted in the second axial bore at least adjacent or past the distal portion of the notch clip, wherein the notch clip is maintainable adjacent the catheter hub throughout a range of positions from being in forceful contact with the catheter hub to being spaced from the catheter hub when the needle cover is inserted in the first axial bore and the tip of the needle is inserted in the second axial bore at least adjacent or past the distal portion of the notch clip, wherein the notch clip does not intersect the second axial bore when the notch clip is in a non-biased position and wherein the needle cover and the notch clip may rotate in a frictionless to near frictionless relationship relative to one another when the notch clip is in the non-biased position.

'047 Patent, 9:16-57.

## II.   DISCUSSION

### A.   Claim Construction Principles Generally

Patent claim construction represents an issue of law, to be decided by the court. *Aventis Pharma S.A. v. Hospira, Inc.,* 675 F.3d 1324, 1329 (Fed. Cir. 2012); *Cybor Corp. V. FAS Techs., Inc.,* 138 F.3d 1448, 1456 (Fed. Cir. 1998) (*en banc*); *see also Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004) ("The meaning and scope of patent claim terms, as determined by a district court's claim construction rulings, are legal issues central to most patent cases.").  "Claim construction is a legal statement of the scope of the patent right; it does not turn on witness credibility, but on the content of the patent documents." *Lighting Ballast Control, LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1284 (Fed. Cir. 2014) (*en banc*).

As a general rule, a court tasked with construing a patent must assign claim terms their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the patent specification and prosecution history.[3] *Butamax(TM) Advanced Biofuels LLC v. Gevo, Inc.*, 746 F.3d 1302, 1308-09 (Fed. Cir. 2014);

---

[3]    Neither AMC nor Smiths Medical has offered a definition for a person of ordinary skill in the art at the times relevant to this case.

*Thorner v. SONY Computer Entm't Am., LLC,* 669 F.3d 1362, 1365 (Fed. Cir. 2012); *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312-13 (Fed. Cir. 2005).  "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313; *accord, Thorner,* 669 F.3d 1365; *see also CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("Generally speaking, we indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning.").

    There are two exceptions to this general rule.  The first involves circumstances in which a patentee has acted as his own lexicographer, setting out a definition of a term that differs from its ordinary and customary meaning.  *Butamax(TM)*, 746 F.3d at 1309; *Thorner*, 669 F.3d at 1365.  "To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning."  *Thorner,* 669 F.3d at 1365 (quoting *CCS Fitness, Inc.*, 288 F.3d at 1366); *accord, Aventis Pharma S.A.*, 675 F.3d at 1330.  Under the second exception, a claim term may also properly be given a meaning that is different than its customary meaning "'when the patentee disavows the full scope of a claim term either in the specification or during

12

prosecution.'" *Butamax(TM)*, 746 F.3d at 1309 (quoting *Thorner,* 669 F.3d at 1366); *accord, Aventis Pharma S.A.*, 675 F.3d at 1330. Both exceptions to the rule that patent terms should be given their ordinary meaning are both narrow and exacting. *Thorner*, 669 F.3d at 1366-67.

While the words of a patent claim will generally control, they should not be interpreted in isolation; "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. A patent's specification often constitutes the "single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. In this respect, a patent specification, which some liken to an internal dictionary, must be carefully reviewed to determine whether, for example, the inventor has used a particular term in a manner inconsistent with its ordinary meaning. *Id.* When resorting to a patent's specification for guidance with respect to disputed claim terms, a court must consider it as a whole, and where possible, all portions should be read in a manner that renders the patent internally consistent. *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1379-80 (Fed. Cir. 2001).

Although the language of a patent specification can provide important clues regarding the proper construction to be accorded to a claim term, there are limitations upon its usefulness. "[W]hile it is true that claims are to be interpreted *in light of* the specification and with a view to ascertaining the invention, it does not follow that limitations from the specification may be read into the claims." *Sjolund v. Musland*, 847 F.2d 1573, 1581 (Fed. Cir. 1988) (emphasis in original). "Nor should particular embodiments in the specification be read into the claims; the general rule is that the claims of a patent are not limited to the preferred embodiment." *Cornell Univ. v. Hewlett-Packard Co.,* 313 F. Supp. 2d 114, 126 (N.D.N.Y. 2004) (Mordue, J.) (citing, *inter alia*, *Texas Digital Sys., Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1204 (Fed. Cir. 2002)).

In addition to the ordinary meaning of a claim term itself and the patent's specification, the prosecution history related to the patent in issue can help inform the determination of a proper claim term construction. *Phillips*, 415 F.3d at 1314. That history is generally comprised of "the complete record of proceedings before the Patent and Trademark Office [("PTO")], including any express representations made by the applicant regarding the intended scope of the claims," and an examination of any relevant prior art. *Vitronics*, 90 F.3d at 1582-83. Such evidence, which

typically chronicles the dialogue between the inventor and the PTO leading up to the issuance of a patent, and thus can act as a reliable indicator of any limitations or concessions on the part of the applicant, oftentimes proves highly instructive on the issue of claim construction. *See Phillips*, 415 F.3d at 1317 ("[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be.").

### B.    Construction of Terms in Dispute

The parties seek construction of several disputed terms contained within the four patents in suit.  Those terms have loosely been grouped into three categories, involving "notch" related terms, "notch clip" related terms, and "means" related terms. [4]

---

[4]    The Patent Rules of this court restrict claim construction to a total of ten terms, absent court approval to expand that limit.  N.D.N.Y. L. Pat. R. 4.4(b).  By presenting three groupings of terms in dispute, cumulatively totaling in excess of ten terms, the parties have effectively circumvented this rule because the terms within each grouping are materially different.  Nonetheless, in the interest of justice, I recommend that Local Patent Rule 4.4.(b) not be strictly enforced in this instance.  *See, e.g., People of State of N.Y. v. Muka*, 440 F. Supp. 33, 36-37 (N.D.N.Y. 1977) (Munson, J.) ("[I]t is axiomatic that a court possess broad discretion in applying its local rules.").

## 1.  Notch-Related Terms

The presence of a notch is a key element of the safety catheter assembly and method disclosed in the four patents in suit, appearing in each of the asserted claims at issue.   The following matrix sets forth the various "notch" related terms in dispute, as well as the parties' proposed definitions of each term:

| Claims | Claim Term | AMC Definition | Smiths Medical Definition |
|---|---|---|---|
| '047 Patent | | | |
| Claim 1 | a continuous circumferential notch extending outwardly in the first axial bore of the catheter hub | a continuous circumferential indentation in an edge or across an inner surface of the catheter hub extending outwardly in the first axial bore of the catheter hub | a continuous, semi-circle-shaped cut-out extending outwardly from the inner wall of the first axial bore of the catheter hub |
| Claim 8 | an outward extending notch in a catheter hub | an outward extending indentation in an edge or across an inner surface of the catheter hub | a cut-out extending outwardly from the inner wall of the first axial bore of the catheter hub |
| Claim 14 | wherein the notch is a continuous circumferential notch | a continuous circumferential indentation in an edge or across an inner surface of the catheter hub | wherein the cut-out is a continuous, semi-circle-shaped cut-out |
| '814 Patent | | | |
| Claim 10 | a notch extending outwardly in the first axial bore of the catheter hub | an indentation in an edge or across an inner surface | a cut-out extending outwardly from the inner wall of the first |

| Claims | Claim Term | AMC Definition | Smiths Medical Definition |
|---|---|---|---|
| | | of the catheter hub extending outwardly in the first axial bore of the catheter hub | axial bore of the catheter hub |
| Claim 11 | an outward extending notch in a catheter hub | an outward extending indentation in an edge or across an inner surface of the catheter hub extending outwardly in the first axial bore of the catheter hub in a catheter hub | a cut-out extending outwardly from the inner wall of the first axial bore of the catheter hub |
| '033 Patent | | | |
| Claims 1 | a notch extending outwardly in said axial bore | an indentation in an edge or across an inner surface of the catheter hub extending outwardly in the first axial bore of the catheter hub | a cut-out extending outwardly from the inner wall of the first axial bore of the catheter hub |
| Claim 10 | a notch extending outwardly in the axial bore | an indentation in an edge or across an inner surface of the catheter hub extending outwardly in the first axial bore of the catheter hub | a cut-out extending from the inner wall of the axial bore of the catheter hub |
| Claims 15 and 30 | A notch therein | an indentation in an edge or across an inner surface of the catheter hub | a cut-out from the inner wall of the second passageway of the catheter hub |
| '206 Patent | | | |
| Claim 1 | A notch having a longitudinal length | an indentation in an edge or across an inner surface of the catheter hub having a longitudinal length | a cut-out extending outwardly from the inner wall of the second passageway of the catheter hub |

| Claims | Claim Term | AMC Definition | Smiths Medical Definition |
|--------|-----------|----------------|---------------------------|
| | | | |
| Claims 5 and 9 | A notch therein | an indentation in an edge or across an inner surface of the catheter hub | a cut-out from the inner wall of the second passageway of the catheter hub |

A comparison of the parties' positions reveals that their dispute over these terms is centered upon whether the notch disclosed in the invention should be described as a cut-out from the inner wall of the axial bore within the catheter hub, and whether it must be configured to be a specific shape, and specifically a semi-circle.

The term "notch" is utilized in the four patents as a noun. A representative excerpt from the patent specifications describes the notch as extending outwardly in the axial bore of the catheter hub, and is "preferably a continuous circumferential notch" enabling the hub to be rotated around the needle cover when the two are fully engaged. *See, e.g.,* '047 Patent, 4:61-65.

Smiths Medical suggests the term "notch" implies that it is formed by being cut out of the inner wall of the axial bore within the catheter hub. None of the four patents in suit, however, specify and limit the manner in which the notch may be formed, or specifically require it to be formed by

cutting out a portion of the inner wall, as suggested by Smiths Medical.  As AMC correctly notes, it is not proper to read a process limitation in an apparatus claim when no such limitation is presented by the patent claims, patent specification, or prosecution history. *Baldwin Graphic Sys., Inc. v. Siebert*, *Inc.,* 512 F.3d 1338, 1344 (Fed. Cir. 2008).  In its response brief, Smiths Medical argues that it is using the term "cut-out" as a noun, and not a verb, and thus is not violating this tenet by limiting the manner in which the notch is to be formed.  The use of the term "cut-out," nonetheless, invokes this ambiguity and allows for the argument at trial that a notch is limited in the way in which it is formed – that is, that the notch is cut-out instead of fashioned in some other way, such as, for example, by injection molding.

While extrinsic evidence is relegated to secondary importance under *Phillips* and its progeny, I note that the construction of the term "notch" offered by AMC comports with the ordinary dictionary definition that term. For example, one dictionary defines notch to mean "[a] groove, incision, or indentation (typically V-shaped in cross-section) in an edge, or across or through a surface."  *See notch, n.*, Oxford English Dictionary ("OED"), *available at* http://www.oed.com/view/Entry/128536?rskey=FvGOIZ&result=1#eid (last

visited July 9, 2014).  Another dictionary defines it to mean "a V-shaped indentation."  *Merriam-Webster's Collegiate Dictionary* ("*Merriam-Webster's* 794 (Frederick C.Mish, *et al.*, eds.) 10th ed. 1998.  AMC's proposed definition is also consistent with other judicial decisions construing that term.  *See Eng'rd Prods. Co. v. Donaldson Co., Inc.*, 165 F. Supp. 2d 836, 878 (N.D. Iowa 2001) (deciding, pre-*Phillips*, that a notch is a V-shaped cut or indentation); *Riddell, Inc. v. Schott Sports, Inc.*, 724 F. Supp. 2d 981, 985 (W.D. Wisc. 2010) (construing a notch as "an indentation of any shape"); *see also Saeilo, Inc. v. Colt's Mfg. Co., Inc.*, 26 F. App'x 966, 971 (Fed. Cir. 2002) (finding that the notch in the patent at issue may be formed "without removing any material").

Having found nothing in the patent claims, specifications, or prosecution histories to suggest otherwise, I recommend a finding that the term "notch" be given its ordinary and customary meaning, and construed in this instance as "an indentation in an edge or across an inner surface of the catheter hub."

Smiths Medical also argues that the shape of the notch specified in the four patents in suit is limited to a semi-circle.  It is generally understood, however, including by those of ordinary skill in the art, that a notch can be of varying shapes.  In attempting to limit the notch specified

in the four patents in suit to being semi-circular in shape, Smiths Medical commits one of the cardinal sins of patent construction by focusing on Figure 4 of the '047 Patent, representing just one embodiment, which depicts a notch in the shape of a semi-circle. It is, of course, well accepted that absent clear indication to the contrary, a claim term is not limited by a representative embodiment, even a preferred embodiment. *See Thorner*, 669 F.3d at 1366 ("It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation. We do not read limitations from the specification into claims; we do not redefine words."); *Cornell Univ.*, 313 F. Supp. 2d at 126 ("Nor should particular embodiments in the specification be read into the claims; the general rule is that the claims of a patent are not limited to the preferred embodiment.").

In addition to refuting Smiths Medical's proposed cut-out limitation, the specifications of the four patents in suit fail to support any requirement that the notch must be semi-circular in shape. There is nothing in the specifications of the four patents in suit that suggests the inventors intended to limit the shape of a notch to a semi-circle. As was previously noted, unless a patentee has acted as his own lexicographer or made concessions during the course of patent prosecution that would limit a

patent term, a term should be given its ordinary meaning as would be understood by a person of ordinary skill in the art. *Butamax(TM)*, 746 F.3d at 1309. In addition, a patentee should be given the full measure of the scope of claims of the patent, and may not be limited by an embodiment, preferred or otherwise, disclosed in the patent specification. *Thorner*, 669 F.3d at 1366; *Cornell Univ.*, 313 F. Supp. 2d at 126. In this instance, there is no evidence that the inventors have acted as their own lexicographers in describing the shape of the notch disclosed in their patents.

Similarly, there is nothing in the prosecution history associated with the four patents to suggest the inventors intended to limit the shape of the notch specified to a semi-circle. Indeed, the prosecution histories associated with the four patents support AMC's proposed construction and refute that the term "notch" must be limited to the shape of a semi-circle. During a reexamination proceeding before the PTO in connection with the '033 Patent, Smiths Medical referred to notches disclosed in prior art references, including U.S. Patent No. 5,458,658 ("Sircom") and U.S. Patent No. 4,944,725 ("MacDonald"). Dkt. No. 28 at 3; Dkt. No. 33-1 at 94-100. Certain embodiments disclosed within those patents reveal notches that are not semi-circular in shape. *See, e.g.,* Dkt. No. 32 at 3 (Figure 6); Dkt. No. 32-1 at 6 (Figure 7). In citing that prior art, Smiths

Medical plainly recognized that, for purposes of the invention and the evaluation of prior art, a notch need not be semi-circular in shape.[5]

A subsidiary, related issue is presented by the addition of the phrase "continuous circumferential" to the word "notch," as found in Claims 1 and 14 of the '047 Patent. AMC suggests that the phrase be given its ordinary meaning, and that it should be construed as a continuous notch about the interior of the catheter hub. Consistent with its argument regarding the term "notch," Smiths Medical insists that the continuous circumferential

---

[5]     I have considered whether Smiths Medical should be judicially estopped from arguing that the notches disclosed must be semi-circular. "A party who 'assumes a certain position in a legal proceeding, and succeeds in maintaining that position,' can be judicially estopped from assuming a contrary position thereafter simply because his interests have changed." *Lia v. Saporito*, 541 F. App'x 71, 73 (2d Cir. 2013) (quoting *N.H. v. Me.*, 532 U.S. 742, 749 (2001)). In the Second Circuit, "judicial estoppel will apply if: 1) a party's later position is clearly inconsistent with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010). To satisfy the first element, there must be an "irreconcilable direct conflict" between the earlier statement and the position the party seeks to adopt before the court. *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 119 (2d Cir. 2004).

In this case, AMC suggests that Smiths Medical is precluded from arguing that a notch is semi-circular in this federal court action because it cited to Sircom and MacDonald, both of which disclose a non-semi-circular-shaped notch. This is not the type of inconsistency envisioned by judicial estoppel. *Compare Rodal*, 369 F.3d at 119 (finding the plaintiff was not estopped from arguing that he would have been able to perform the essential functions of his job in May 1999 when he requested an accommodation because of a statement he made in a parallel state court proceeding that he was unable to perform any of his duties as of July 1999) *with Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 7 (2d Cir. 1999) (applying judicial estoppel where the plaintiff, in his SSDI proceedings, stated "that he was incapable of standing for any length of time or of walking and that he required work he could perform seated" but then in his ADA litigation took the position that "he was able to stand and walk for a substantial portion of the work day").

notch must be a continuous, semi-circle-shaped cut-out. For the same reasons noted above, I reject this latter proposal as containing two limitations not specified in either the intrinsic or available extrinsic evidence. First, once again, defendant specifies a "cut-out," implying that a specific process must be utilized to form the notch, despite the fact that nowhere in the patents, as well as the specifications and prosecution histories associated with them, is there any limitation, or indeed even a discussion, as to how the notch is formed, and specifically whether it must be cut-out, or instead could be formed through another means, such as by mold injection. Secondly, the defendant once again insists that the notch must be semi-circular in shape, an argument that draws no support from either the specification or prosecution history. Similarly, available extrinsic evidence defies defendant's theory. As discussed above, the dictionary definition of the term "notch" suggests that it is a concave or V-shaped indentation in an edge or across a surface. *See notch, n.*, OED, *available at* http://www.oed.com/view/Entry/128536?rskey=FvGOIZ&result=1#eid (last visited July 9, 2014); *Merriam-Webster's* 794.

For this term I again recommend a definition that tracks AMC's proposals. The term "circumferential" pertains to the circumference of an object, and "circumference" is generally understood as the perimeter of a

circle.  *See, e.g., circumference, n*., OED, *available at* http://www.oed.com/view/Entry/33281?rskey=7IaAlR&result=1&isAdvanced=false#eid (last visited July 9, 2014) ("The line that forms the encompassing boundary, esp. of anything of a rounded form. . . *spec.* in *Geom.* The curved line which forms the boundary of a circle or other closed curve[.]"); *Merriam-Webster's*, 208 ("[T]he perimeter of a circle[.]"). This is consistent with, and indeed the only way in which, the invention disclosed can function as envisioned.  The continuous circumferential notch specified in Claim 1 of the '047 Patent, for example, extends outwardly in the first axial bore of the catheter hub.  The term "bore" suggests a cylindrical-shaped hole.  *See bore, n.*, OED, available at http://www.oed.com/view/Entry/21636?rskey=xNvj4k&result=1#eid (last visited July 9, 2014) ("A hole made by boring, a perforation; an aperture (irrespective of shape), a chink, crevice, or cranny; in later use chiefly an auger hole, or other cylindrical perforation."); *Merriam-Webster's*, 133 ("[T]o make (as a cylindrical hole) by boring or digging away at material[.]").  Moreover, the bore must be circular in nature in order to permit the needle cover and notch clip to rotate relative to one another when the notch clip is in a non-biased position, as required in Claim 1. '047 Patent, 9:53-57.  Only if the notch continues fully around the inner

portion of the catheter hub will the needle cover be free to rotate while the notch clip is engaged with the notch.

This construction draws support from the specification of the four patents in suit. The specification of the '047 Patent, for example, describes the notch as being "a continuous circumferential notch," "enabl[ing] the catheter hub to be rotated around the needle cover when the two are fully engaged." '047 Patent, 4:61-65. The notch clip engages the notch and allows the catheter hub to rotate around the needle. *Id.* at 5:34-42. For this to occur, a catheter notch must, by definition, extend completely around the full circumference of the inside of the catheter hub. *Id.*

The addition of the word "continuous" further suggests that the notch must continue circumferentially without interruption. The addition of the phrase "catheter hub" affixes the location, implying that the notch must be located within the catheter hub. Accordingly, I recommend that the term "continuous circumferential notch" be construed to mean that the indentation or edge must extend outwardly continuously around the interior, axial bore of the catheter hub.

The remaining notch-related claim terms in dispute center are "in the first axial bore of the catheter," "in the catheter hub," and "therein," all of

which relate to the proper location of the notch.  Once again, Smiths Medical attempts to restrict the meaning of these terms by limiting the manner in which the notch is formed.  The patent claims in issue, however, specifically recite that the notch is located "in a catheter hub." '047 Patent, Claim 8; *see also, e.g.,* '033 Patent, Claim 1 ("[A] catheter hub having an axial bore extending through said catheter hub and a notch extending outwardly in said axial bore"); '206 Patent, Claim 5 ("[A] catheter hub having . . . a notch therein").  As discussed above, nothing in the claim terms restrict the means by which the notch is to be formed.  Moreover, the location of the notch is referred to in only general terms within the claims, and it is not limited by the specification as having to extend "from the inner wall."  Nothing in the prosecution histories associated with the four patents in suit alters this result, nor does the extrinsic evidence render this conclusion inconsistent.  Accordingly, I recommend that the following constructions be attributed to the notch-related claims now in issue:

| Claims | Claim Term | Construction |
| --- | --- | --- |
| '047 Patent | | |
| Claim 1 | a continuous circumferential notch extending outwardly in the first axial bore of the catheter hub | a continuous circumferential indentation in an edge or across an inner surface of the catheter hub extending outwardly in the first axial bore of the catheter hub |
| Claim 8 | an outward extending notch in a catheter | an outward extending |

| Claims | Claim Term | Construction |
|---|---|---|
| | hub | indentation in an edge or across an inner surface of the catheter hub |
| Claim 14 | wherein the notch is a continuous circumferential notch | a continuous circumferential indentation in an edge or across an inner surface of the catheter hub |
| '814 Patent | | |
| Claim 10 | a notch extending outwardly in the first axial bore of the catheter hub | an indentation in an edge or across an inner surface of the catheter hub extending outwardly in the first axial bore of the catheter hub |
| Claim 11 | an outward extending notch in a catheter hub | an outward extending indentation in an edge or across an inner surface of the catheter hub |
| '033 Patent | | |
| Claims 1 | a notch extending outwardly in said axial bore | an indentation in an edge or across an inner surface of the catheter hub extending outwardly in the first axial bore of the catheter hub |
| Claim 10 | a notch extending outwardly in the axial bore | an indentation in an edge or across an inner surface of the catheter hub extending outwardly in the first axial bore of the catheter hub |
| Claims 15 and 30 | a notch therein | an indentation in an edge or across an inner surface of the catheter hub |
| '206 Patent | | |
| Claim 1 | a notch having a  longitudinal length | an indentation in an edge or across an inner surface of the catheter hub having a longitudinal length |
| Claims 5 and 9 | a notch therein | an indentation in an edge or across an inner surface of the catheter hub |

2.      Notch Clip-Related Terms

The parties next disagree over the proper construction for various claim terms incorporating the words "notch clip."  The following chart reflects their disagreements.

| Claims | Claim Term | AMC Definition | Smiths Medical Definition |
|---|---|---|---|
| **'047 Patent** | | | |
| Claim 1 | a notch clip joined with the needle cover | a notch clip joined with the needle cover | a notch clip attached to the needle cover by a resilient arm |
| Claims 8 and 11 | the needle cover including a notch clip | The needle cover including a notch clip | a notch clip attached to the needle cover by a resilient arm |
| **'033 Patent** | | | |
| Claims, 1, 13, and 25 | a needle cover having a notch clip | a needle cover having a notch clip | a notch clip attached to the needle cover by a resilient arm |
| Claim 10 | a notch clip disposed in a catheter hub | a notch clip disposed in a catheter hub | a notch clip being disposed in a catheter hub via a resilient arm |
| Claim 15 | a needle cover having a notch clip, said notch clip comprising a resilient material | a needle cover having a notch clip, said notch clip comprising a resilient material | a notch clip attached to the needle cover by a resilient arm |
| Claim 30 | a needle cover having a notch clip and a first passageway extending therethrough for receiving said needle, said notch clip comprising a resilient material | a needle cover having a notch clip and a first passageway extending therethrough for receiving said needle, said notch clip comprising a resilient material | a notch clip attached to a needle cover by a resilient arm, the needle cover having a first passageway extending therethrough for receiving said needle |

| Claims | Claim Term | AMC Definition | Smiths Medical Definition |
|---|---|---|---|
| '206 Patent | | | |
| Claim 1 | a notch clip positionable to engage the notch of the catheter hub | a notch clip attached to the needle cover by a resilient arm facilitating engagement with the notch of the catheter hub | a notch clip attached to the needle |
| Claim 5 | a needle cover having a notch clip and a first passageway extending there through for receiving said needle, said notch clip comprising a resilient material | a needle cover having a notch clip and a first passageway extending there through for receiving said needle, said notch clip comprising a resilient material | a notch clip attached to a needle cover by a resilient arm, the needle cover having a first passageway extending there through for receiving said needle |
| Claim 9 | a needle cover having a notch clip | a needle cover having a notch clip | a notch clip attached to the needle cover by a resilient arm |
| '814 Patent | | | |
| Claim 10 | a notch clip positionable to engage the notch of the catheter hub | a notch clip positionable to engage the notch of the catheter hub | a notch clip attached to the needle cover by a resilient arm facilitating engagement with the notch of the catheter hub |

The parties do not disagree over the proper construction of the terms

"notch clip" or "needle cover."  Instead, their dispute centers upon the

30

relationship between the two.  Smiths Medical attempts to cabin the relationship between the notch clip and needle/needle cover by arguing that, despite the use of different terms such as "including," "having," "joined with," and "disposed in," each of the above listed notch-clip terms should be construed identically to mean that the notch clip is attached to the needle cover or needle by a resilient arm.[6]

This argument is unsupported by the patent specifications.  It ignores the inventors' use of different terms to describe the relationship between the notch clip and needle/needle cover, attributing the same relationship to all of those configurations.  Nothing in the specifications of the four patents in suit, or the prosecution histories associated with them, however, reflect an intent on the part of the inventors to limit their invention to a notch clip attached to the needle cover by a resilient arm.  A person of ordinary skill in the art would readily recognize that the various embodiments covered by the claim terms with those differing descriptions are distinct.  To lump them into a single description is to ignore the basic

---

[6]     With respect to the words "including," "having," "joined with," and "disposed in" as contained within the disputed, notch-clip-related claim terms, AMC offers general dictionary definitions because the terms are not otherwise defined in the patents, and there is nothing in the prosecution history that would suggest an intent to depart from the generally accepted definitions.  I agree that those appear to be commonly understood terms, and find nothing in either the specifications or Smiths Medical's submissions to suggest otherwise or to evidence an intent to depart from those accepted definitions.

principle of claim differentiation that provides that different claims are presumed to be different in scope. *See Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006) ("[T]his court has characterized claim differentiation . . . as the 'presumption that each claim in a patent has a different scope.'" (quoting *Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 1998)).

Smiths Medical's proposed construction also potentially eliminates the embodiment depicting "a notch clip comprising of a ball bearing **630** which engages a concave notch disposed in catheter hub **618** to releasably lock a needle cover **622** to catheter hub **618**." While the '206 Patent specification provides little insight as to how the embodiment illustrated in Figure 15 would function, the notch clip depicted does not appear to be attached to the needle cover, at least not by means of a resilient arm. Because a claim term should not be construed to exclude an embodiment disclosed in the patent specification, *Butamax(TM) Advanced Biofuels LLC*, 746 F.3d at 1312, I find Smiths Medical's proposal inappropriate. *See* '206 Patent, Fig. 15 and 7:44-51.

Moreover, because I do not find that the notch clip-related terms involve words that are complex or difficult to understand in the context of the claims and the specification, I agree with AMC that they require no

further construction. *See Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.").

Having found nothing to suggest otherwise, I conclude that the various terms now under consideration do not require that the notch clip be attached to the needle cover by a resilient arm, and therefore recommend rejection of Smiths Medical's proposed constructions. Simply stated, while it is true that in many of embodiments depicted in the four patents in suit the notch clip is attached to the needle cover by a resilient arm, this does not suffice to deprive the patentee of the full scope of the patent claims.

Based upon the foregoing, I recommend that the court not construe the notch clip-related terms.

### 3. Means Terms

The last area of disagreement surrounds two "means" claims

contained within the '033 Patent.  The relevant excerpts from those claims

and the parties proposed constructions are as follows:

| Claims | Claim Term | AMC Definition | Smiths Medical Definition |
|---|---|---|---|
| '033 Patent | | | |
| Claim 13 | means for selectively maintaining a notch clip adjacent the needle | a structure or device, and its equivalents, which allows a notch clip to be maintained in positions of in contact with the needle and not in contact with the needle, as well as in contact with the catheter hub and not in contact with the catheter hub | the structure corresponding to the claimed function is a continuous, semi-circle-shaped cut-out extending outwardly from the inner wall of the first axial bore of the catheter hub. |
| Claim 28[7] | resilient means cooperating with said needle for locking said needle cover to said catheter hub and for offering resistance from obstruction of said first passageway | resilient means cooperating with said needle for locking said needle cover to said catheter hub and for offering resistance from obstruction of said first passageway | the structure corresponding to the claimed function is a notch clip attached to the needle cover by a resilient arm |

Having conferred, the parties agree that these two provisions

represent means-plus-function limitations properly included pursuant to 35

---

[7]  Claim 28 was added as a result of the issuance by the PTO of an *ex parte* reexamination certificate on October 4, 2011.  Dkt. No. 7-3 at 19.

U.S.C. § 112, ¶ 6.[8]  "The first step in construing such a limitation is to identify the function of the means-plus-function limitation."  *Tex. Digital Sys., Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1208 (Fed. Cir. 2002).  Once that is accomplished, the "next step is to identify the corresponding structure in the written description necessary to perform that function." *Tex. Digital Sys., Inc.*, 308 F.3d at 1208.  "[S]tructure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim."  *B. Braun Med., Inc. v. Abbott Labs*, 124 F.3d 1419, 1424 (Fed. Cir. 1997); *accord, Tex. Digital Sys., Inc.*, 308 F.3d at 1208; *see also CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002) ("[A] claim term will cover nothing more than the corresponding structure or step disclosed in the specification, as well as equivalents thereto, if the patentee phrased the claim in step- or means-plus-function format.").

---

[8]    That section provides as follows:

> an element in a claim for a combination may be expressed as a means or step for performing a specified function without recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification or equivalents thereof.

35 U.S.C. § 112, ¶ 6.

With respect to the first means-plus-function term in dispute, the parties agree that function of the limitation is "selectively maintaining a notch clip adjacent the needle." The parties disagree, however, regarding the corresponding structure necessary to perform that function. To be clear, AMC's proposal does not identify a specific structure, but instead vaguely references a "structure" or "device," and then recites the function in different terms. *See* Dkt. No. 22-1 at 6-7 ("[A] structure or device, and its equivalents, which allows a notch clip to be maintained in positions of in contact with the needle and not in contact with the needle, as well as in contact with the catheter hub and not in contact with the catheter hub."). On the other hand, Smiths Medical proposes the structure necessary to perform the function identified in the disputed term is merely the notch. Dkt. No. 22-1 at 12. The court disagrees with both parties' proposals.

First, AMC's proposal does not provide any guidance regarding the structure necessary to "selectively maintain[]a notch clip adjacent the needle." Because "the 'means' term in a means-plus-function limitation is essentially a generic reference for the corresponding structure disclosed in the specification," *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1308 (Fed. Cir. 1998), the court must be careful to precisely identify the structure necessary to perform the function in the

disputed limitation.  *See Kahn v. Gen. Motors Corp.*, 135 F.3d 1472, 1476 (Fed. Cir. 1998) ("The duty to link or associate structure in the specification with the function is the *quid pro quo* for the convenience of employing [section] 112, ¶6."); *Rackman v. Microsoft Corp.*, 102 F. Supp. 2d 113, 120 (E.D.N.Y. 2000) ("This second step [of the means-pllus-function analysis regarding identifying the structure corresponding to the function] is required because a means-plus-function claim can only be construed to cover any 'corresponding structure' disclosed in the patent, and their equivalents.").  Accordingly, AMC's proposed definition of the disputed "means" term is insufficiently precise.

With respect to Smiths Medical's proposal, I find that, in addition to the notch, other structures comprising the patent correspond to the identified function of "selectively maintaining a notch clip adjacent the needle."  The disputed "means" term appears in independent Claim 13 of the '033 Patent, and reads as follows:

> A catheter assembly comprising: . . .
> means for selectively maintaining a notch clip
> adjacent the needle throughout a range of positions
> from being in contact with the needle to being
> generally spaced from the needle and the notch clip
> adjacent the catheter hub throughout a range of
> positions from being in contact with the catheter hub
> to being generally spaced from the catheter hub to
> lock the catheter hub to the needle cover while

being operable to move the needle relative to the notch clip in at least one of a friction less and near friction less relationship.

'033 Patent, 9:60-10:13. The summary of the invention describes, in a second aspect of the invention,

a method for using safety intravenous catheter assembly which includes inserting a needle through a needle cover and past a notch clip disposed in a catheter hub having an axial bore extending through the catheter hub and a notch extending through the catheter hub and a notch extending outwardly in the axial bore to lock the catheter hub to the needle cover, selectively maintaining the notch clip adjacent the needle throughout a range of positions from being in forceful contact with the needle to being generally spaced from the needle, selectively maintaining the notch clip adjacent the catheter hub throughout a range of positions from being in forceful contact with the catheter hub, and moving the needle relative to the notch clip in a near frictionless relationship.

*Id.* at 2:7-20. According to these excerpts of the specifications, when the needle is inserted in the needle cover and the needle cover is engaged with the catheter hub, the notch clip is maintained adjacent the needle by way of the needle, needle cover, catheter hub, and notch. *Id.*; *see also id.* at 4:30-34 ("A notch clip **30** is joined via a resilient arm **53** with needle cover **22** and positionable to engage notch **28** of catheter hub **18**. This

enables catheter hub **18** to be fixedly connected so that catheter hub **18** does not rotate relative needle cover **22** when the two are fully engaged."); *id.* at 5:41-45 ("FIG. **5** illustrates safety intravenous catheter assembly **10** in the configuration for insertion into the patient. The needle maintains the notch clip in the notch and automatically inhibits the catheter hub from disengaging from the needle cover prematurely.").  By virtue of the notch clip engaging the notch, the needle cover becomes locked with the catheter hub, which permits the needle to move through the axial bore without the needle cover prematurely disengaging.  This process is executed properly only if the notch clip remains adjacent to the needle cover (in a frictionless state).  All of the structures involved in this process, including the notch, needle, needle cover, and catheter hub, assist in maintaining the notch clip in a position adjacent to the needle. Accordingly, I conclude that the structures corresponding to the function of "selectively maintain[] a notch clip adjacent the needle" are the notch, needle, needle cover, and catheter hub.

In the court's view, Smiths Medical's proposition that the corresponding structure is only the notch is not supported by the specification.  It is clear from the specification that (at least) the needle plays a role in maintaining the notch adjacent the needle.  More

specifically, the specification explains that "[t]he needle maintains the notch clip in the notch and automatically inhibits the catheter hub from disengaging from the needle cover prematurely."  '033 Patent, 5:45-47.  A review of the specification as a whole, however, reveals that, when the needle is positioned such that the adjacency of the notch is necessary (when the needle is inserted in the needle cover and the needle cover engages the catheter hub), the needle cover, needle, and catheter hub assist the notch in maintaining the notch clip adjacent the needle.

Turning now to the second "means-plus-function" term disputed by the parties, they disagree regarding the proper construction of the phrase "resilient means cooperating with said needle for locking said needle cover to said catheter hub and for offering resistance from obstruction of said first passageway."  The full claim element in which this phrase appears is as follows:

> A catheter assembly comprising:
> Resilient means cooperating with said needle for locking said needle cover to said catheter hub and for offering resistance from obstruction of said first passageway, at least a portion of an inner surface of said resilient means positioned away from said needle when said needle is disposed in said needle cover, and when said needle cover is completely removed from said catheter hub said resilient means is not in contact with said needle, said resilient means being maintainable adjacent said

> needle throughout a range of positions from being in
> contact with said needle to being generally spaced
> from said needle when said tip of said needle is
> inserted at least adjacent or past a distal portion of
> said resilient means, and wherein said needle and
> said resilient means are moveable in at least one of
> a frictionless and near frictionless relationship
> relative to one another when needle cover is locked
> to said catheter hub.

'033 Patent, *Ex Parte* Reexamination Certificate, 3:14-3:37.

The parties agree that the functions disclosed in the disputed term are (1) "cooperating with said needle for locking said needle cover to said catheter hub," and (2) "offering resistance from obstruction of said first passageway."  As a proposed construction of the term at issue, AMC offers "a structure or device, and its equivalents, which includes a resilient portion and which cooperates with the needle cover to lock the needle cover to the catheter hub and which offers a resistance from obstruction of said first passageway."  Smiths Medical, on the other hand, proposes that the corresponding structure be defined as the notch clip.  Because AMC's proposal does not identify a structure necessary to perform the functions disclosed in the disputed term, I reject it for the same reasons discussed above with respect to AMC's proposed construction for the first "means" term.  Notwithstanding, it appears that AMC agrees with Smiths Medical that the structure necessary to "cooperat[e] with said needle for locking

said needle cover to said catheter hub and for offering resistance from obstruction of said first passageway" is the notch clip.  *See* Dkt. No. 26 at 35 ("The corresponding structure, material, or acts described in the specification which perform this function includes a notch clip.").

The '033 Patent's specification supports this conclusion.  For example, the specification explains, in reference to an embodiment of the patent, that "[a] notch clip **30** is joined via a resilient arm **33** with needle cover **22** and positionable to engage notch **28** of catheter hub **18**.  This enables catheter hub **18** to be fixedly connected so that catheter hub **18** does not rotate relative needle cover **22** when the two are fully engaged." '033 Patent, 4:30-34.  The specification also states that "[w]hen the needle is inserted in the second axial bore at least adjacent or past an upper distal portion of the notch clip, the notch clip can engage the side of the needle and notch **28** and lock the catheter hub in engagement with the needle cover."  *Id.* at 5:38-42.  The specification also explains that, in one embodiment, "a safety intravenous catheter assembly **610** in accordance with the present invention may include a notch clip comprising a ball bearing **630** which engages a concave notch disposed in catheter hub **618** to releasably lock a needle cover **622** to catheter hub **618**."  *Id.* at 7:45-50.  In light of the specification and the parties' implicit agreement, I

find that the structure necessary to "cooperat[e] with said needle for locking said needle cover to said catheter hub and for offering resistance from obstruction of said first passageway" is the notch clip.

Accordingly, I recommend that the "means" terms at issue be construed as follows:

| Claims | Claim Term | Function | Corresponding Structure(s) |
|--------|-----------|----------|---------------------------|
| Claim 13 | means for selectively maintaining a notch clip adjacent the needle | selectively maintaining a notch clip adjacent the needle | notch, needle, needle cover, catheter hub |
| Claim 28 | resilient means cooperating with said needle for locking said needle cover to said catheter hub and for offering resistance from obstruction of said first passageway | cooperating with said needle for locking said needle cover to said catheter hub and offering resistance from obstruction of said first passageway | notch clip |

III.  <u>SUMMARY AND RECOMMENDATION</u>

At issue in connection with the four patents in suit are claim terms that are, in large part, relatively straightforward and easily understood, with no indication from either the patent specifications or prosecution history that the inventors intended to depart from the ordinary meanings associated with those terms.  Having carefully considered the arguments

43

and submissions of the parties, it is hereby respectfully,

RECOMMENDED that the disputed claim terms now at issue be

construe as follows:

(1)    As to the notch-related terms:

| Claims | Claim Term | Construction |
|---|---|---|
| '047 Patent | | |
| Claim 1 | a continuous circumferential notch extending outwardly in the first axial bore of the catheter hub | a continuous circumferential indentation in an edge or across an inner surface of the catheter hub extending outwardly in the first axial bore of the catheter hub |
| Claim 8 | an outward extending notch in a catheter hub | an outward extending indentation in an edge or across an inner surface of the catheter hub |
| Claim 14 | wherein the notch is a continuous circumferential notch | a continuous circumferential indentation in an edge or across an inner surface of the catheter hub |
| '814 Patent | | |
| Claim 10 | a notch extending outwardly in the first axial bore of the catheter hub | an indentation in an edge or across an inner surface of the catheter hub extending outwardly in the first axial bore of the catheter hub |
| Claim 11 | an outward extending notch in a catheter hub | an outward extending indentation in an edge or across an inner surface of the catheter hub |
| '033 Patent | | |
| Claims 1 | a notch extending outwardly in said axial bore | an indentation in an edge or across an inner surface of the catheter hub extending |

| Claims | Claim Term | Construction |
|---|---|---|
| | | outwardly in the first axial bore of the catheter hub |
| Claim 10 | a notch extending outwardly in the axial bore | an indentation in an edge or across an inner surface of the catheter hub extending outwardly in the first axial bore of the catheter hub |
| Claims 15 and 30 | a notch therein | an indentation in an edge or across an inner surface of the catheter hub |
| '206 Patent | | |
| Claim 1 | a notch having a  longitudinal length | an indentation in an edge or across an inner surface of the catheter hub having a longitudinal length |
| Claims 5 and 9 | a notch therein | an indentation in an edge or across an inner surface of the catheter hub |

(2)    As to notch-clip related terms:

| Claims | Claim Term | Construction |
|---|---|---|
| Passim | notch clip | no further construction required |
| '047 Patent | | |
| Claim 1 | a notch clip joined with the needle cover | no further construction required |
| Claims 8 and 11 | the needle cover including a notch clip | no further construction required |
| '033 Patent | | |
| Claims 1,13, and 25 | a needle cover having a notch clip | no further construction required |
| Claim 10 | a notch clip disposed in a catheter hub | no further construction required |
| Claim 15 | a needle cover having a notch clip, said notch clip comprising a resilient material | no further construction required |

| Claims | Claim Term | Construction |
|---|---|---|
| | | |
| Claim 30 | a needle cover having a notch clip and a first passageway extending therethrough for receiving said needle, said notch clip comprising a resilient material | no further construction required |
| '206 Patent | | |
| Claim 1 | a notch clip positionable to engage the notch of the catheter hub | no further construction required |
| Claim 5 | a needle cover having a notch clip and a first passageway extending there through for receiving said needle, said notch clip comprising a resilient material | no further construction required |
| Claim 9 | a needle cover having a notch clip | no further construction required |
| '814 Patent | | |
| Claim 10 | a notch clip positionable to engage the notch of the catheter hub | no further construction required |

(3)     As to the "means" terms:

| Claims | Claim Term | Function | Corresponding Structure(s) |
|--------|-----------|----------|---------------------------|
| Claim 13 | means for selectively maintaining a notch clip adjacent the needle | selectively maintaining a notch clip adjacent the needle | notch, needle, needle cover, catheter hub |
| Claim 28 | resilient means cooperating with said needle for locking said needle cover to said catheter hub and for offering resistance from obstruction of said first passageway | cooperating with said needle for locking said needle cover to said catheter hub and offering resistance from obstruction of said first passageway | notch clip |

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     July 9, 2014
           Syracuse, New York

David E. Peebles
U.S. Magistrate Judge